HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CABELA'S RETAIL, INC.,<br><br>    Plaintiff,<br><br> v.<br><br>HAWKS PRAIRIE INVESTMENT, LLC,<br><br>    Defendant. | No. 11-cv-5973-RBL<br><br>(Dkt. #104) |

*The only universal consequence of a legally binding promise is, that the law makes the promisor pay damages if the promised event does not come to pass. In every case it leaves him free from interference until the time for fulfillment has gone by, and therefore free to break his contract if he chooses.*

~ Oliver Wendell Holmes[1]

With those words, Justice Holmes spurred a debate regarding the amoral nature of contracts and their remedies, a debate that has morphed into today's current discourse on efficient breach.[2] Before this Court appears to be a classic case of efficient breach.

---

[1] O.W. Holmes, Jr., *The Common Law* 301 (1881); *see also* O.W. Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 462 (1897) ("The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else.  If you commit a tort, you are liable to pay a compensatory sum. If you commit a contract, you are liable to pay a compensatory sum unless the promised event comes to pass, and that is all the difference.").

Order - 1

In 2006–07, Cabela's Retail, Inc. (the "World's Foremost Outfitter") contracted with Hawks Prairie Investment, LLC, a commercial developer, to open a new store in Lacey, Washington.  As an inducement to attract Cabela's as an anchor tenant, Hawks Prairie agreed to sell 27 acres to Cabela's for $10.00 and pay the company $5 million in cash.  In return, Cabela's would build and open a store, operate it for at least twelve years, and refrain from building a competing store in western Washington for five years.  The contract provided, however, that if Cabela's opened a new store early, it would have to pay back the $5 million and Hawks Prairie would have the "right to terminate and repossess" the property.  Cabela's apparently determined that opening a new store early was more profitable than adhering to the contract, and its new store opened at the Tulalip Tribes Indian Reservation four years and six months later (six months early).  Cabela's now argues that the restriction is an invalid restraint of trade, that repayment is an unlawful penalty, and that in any event, they didn't really breach the contract all that much.  For the reasons below, the Court disagrees.  And, as Justice Holmes noted, "the law makes the promisor pay damages if the promised event does not come to pass."

### I.  BACKGROUND

In the early 2000s, Hawks Prairie, a small commercial development enterprise owned by Scott Griffin and Tri Vo, bought 250 acres next to Interstate 5, planning to build a shopping mall called "Lacey Gateway."  (Def.'s Mot. for Summ. J. at 3, Dkt. #104.)  The company sought an anchor tenant: Cabela's.

**A.  The Purchase and Sale Agreement**

On November 7, 2006, Hawks Prairie and Cabela's signed a Purchase and Sale Agreement, in which Hawks Prairie "sold" 27 acres to Cabela's—for $10.00.  (Kelsey Decl., Ex. 1, Dkt. #112-1, p. 4.)  The contract contained an "Addendum," specifying four key terms: a $5 million dollar payment; a continuous-operation clause; radius restriction; and build-out promise.

---

[2] Whether he meant to endorse an amoral view of contracts is a matter of some argument in itself.  *See* Joseph M. Perillo, *Misreading Oliver Wendell Holmes on Efficient Breach and Tortious Interference*, 68 Fordham L. Rev. 1085 (2000).

### 1.  Five Million Dollar Contribution

First, upon opening of the store "fully staffed and equipped, within one (1) year from Closing, . . . [Hawks Prairie] agrees to pay [Cabela's] cash in the amount of $5,000,000." (*Id.*, Ex. 2 ¶ 5, Dkt. #112-1, p. 30.)

### 2.  Continuous Operation Clause

Second, under the continuous-operation clause, Cabela's agreed to operate the store for at least 12 years:

> 6.   Upon Completion of the store, Buyer agrees to operate the store as a "Cabela's" or as an affiliate of Buyer of the same type as Buyer or its affiliate operates in other parts of the country for a minimum of twelve (12) years from the date of opening

(*Id.* ¶ 6.)  The clause also specified the remedy for breach.  If Cabela's shuttered the store in the first six years, it would "refund the Five Million dollar contribution" and pay the "then fair market value of the Real Property."  Or, in the alternative, it would refund the $5 million and offer Hawks Prairie a sixty-day option to purchase the property and improvements at fair market value "minus the fair market value of the Real Property." (*Id.*)  (That is to say, if Cabela's breached, Hawks Prairie could elect a cash payment of the value of the real estate or buy the entire store and pay only the amount of improvements to the real estate.)

### 3.  Radius Restriction

Third, the radius restriction—the key provision at issue in this case—bars Cabela's from opening a competing store for five years after the opening:

> 8.   Buyer agrees that neither it nor any affiliate shall open a "Cabela's" store or any affiliated store (a "Competing Store") in Western Washington for a period of five (5) years from the date its store opens on the Real Property.  In the event Buyer or any affiliate of Buyer breaches the terms of this paragraph, Seller will suffer irreparable damages and may seek an injunction to stop the construction and/or operation of the Competing Store and/or may sue Buyer for damages, which may include incidental and consequential damages.  In addition, if a Competing Store opens, whether or not Seller seeks damages or an injunction, Buyer shall repay Seller the money Seller paid to Buyer pursuant to paragraph 5 of this Addendum and Seller shall have the right to terminate and repossess the Real Property as set forth above in Paragraph 6.

(*Id.* ¶ 8.)  The contract defined a "Cabela's store" as "a Cabela's retail outdoor/sporting goods store as generally operated in the United States by [Cabela's] on the date of this deed, as such

operation may hereafter evolve." (*Id.*)  The contract also specified the counties in which a competing store was barred—all counties west of the Cascades, including Snohomish County.[3] (*Id.*)

### 4. Build Out Provision

Lastly, Hawks Prairie agreed to begin construction of 400,000 square feet of commercial space within six years of the store's opening; another 200,000 at year 8; and another 400,000 by year 10.  (*Id.* ¶ 7.)  Cabela's had an exclusive remedy for breach: "[Cabela's] sole remedy for [Hawks Prairie's] breach of the foregoing obligations to commence construction . . . is an increase in the credits to be given [Cabela's] in the event [it] does not operate its store for the full twelve (12) year period . . . ." (*Id.*)  Thus, if Hawks Prairie failed to build the rest of Lacey Gateway, Cabela's only recourse was that it might operate its store for less than the original 12-years planned.

### B. Opening and Covenants

In November 2007—the key date for timing the parties' obligations—Cabela's completed construction and opened the Lacey store.  Cabela's emphasizes that it opened what it calls a "destination store," with a museum, "indoor mountains with lifelike wildlife exhibitions," and aquariums.  (Pl.'s Resp. at 3, Dkt. # 111; Sancken Decl., Ex. 1, Dkt. #113-1, pp. 24, 87, 93.)

After opening the store, Cabela's counsel sent a letter to Hawks Prairie demanding payment of the $5 million:

> The store is open and the $5,000,000 payment is now due. We have foregone payment far longer than should be reasonably expected. As to the radius restriction, we agree that the agreement clearly provides that we will refrain from opening a store in the listed counties for five years from opening. Obviously, we are in compliance with that provision.

(Willig Decl., Ex. J, Dkt. #108-4, p. 23 (Letter from Cabela's Attorney Kent T. Kelsey)).  Hawks Prairie paid the $5 million, and the parties recorded a "Memorandum of Agreements" with the Thurston County Auditor, detailing the covenants attached to the land.  Quite simply, the

---

[3] The contract defines "Western Washington" as "that geographical area in the state of Washington consisting of the counties of Whatcom, Skagit, Island, Snohomish, King, Kitsap, Pierce, Mason, Grays Harbor, Thurston, Pacific, Lewis, Cowlitz, Clark, Skamania, Wahkiakum, Jefferson, Clallam, and San Juan." (Kelsey Decl., Ex. 2 ¶ 8, Dkt. #112-1, p. 31.)

Memorandum records—word for word—the four contractual agreements of the Purchase and Sale Agreement detailed above (i.e., $5 million payment, continuous operation, radius restriction, and build-out).  As shall be important to Cabela's legal arguments, the Memorandum states the purpose of the radius restriction is to protect retail traffic at Lacey Gateway:

> [Hawks Prairie] anticipates that the presence and continuous long-term operation of the Store as part of the Development, *in the absence of any other Competing Store* in western Washington, will draw significant *retail traffic* to the Development and thus is critically important to [Hawks Prairie's] projections of the economic benefits [it] will derive. . . . The anticipation of such economic benefits is a fundamental assumption upon which Seller entered into the Purchase Agreement.

(Kelsey Decl., Ex. 4, Dkt. #112-1, p. 44) (emphasis added).

Under the Memorandum, Cabela's covenants run with the land, while Hawks Prairie's are personal.  Thus, Cabela's promises "shall bind the Real Property and shall bind [Cabela's] and each and every other person or entity having any fee, leasehold or other interest in any part of the Real Property."  (Kelsey Decl., Ex. 4, Dkt. #112-1, p. 48.)  This provision makes sense of course.  Without it, Cabela's would simply have been able to sell the store and a purchaser could simply stop operating it—circumventing the continuous-operation clause.  Importantly, the promises benefit Hawks Prairie directly and do not automatically transfer to an assignee:

> Each and all of the foregoing covenants of [Cabela's] shall inure to the benefit of [Hawks Prairie] and to any assignee or transferee to whom [Hawks Prairie] *may specifically and expressly assign any or all of such rights pursuant to one or more written instruments* recorded from time to time in the public real estate records of Thurston County, Washington.

(*Id.*) (emphasis added).  Hawks Prairie's covenants are "personal" and benefit Cabela's "and their respective successors and assigns."  (*Id.*).

**C. Bankruptcy, Opening of Tulalip Store, and Procedural Background**

In April 2010, Hawks Prairie filed bankruptcy.  (Def.'s Mot. for Summ. J. at 9, Dkt. #104.)  As Hawks Prairie sought to reorganize, Cabela's filed this suit, seeking a declaratory judgment that the radius restriction was unenforceable.  (Compl. at 4, Dkt. #1-2.)  The Court subsequently allowed Homestreet Bank to intervene, the bank being the primary financier of Lacey Gateway and Hawks Prairie's largest creditor.  (Order Granting Mot. for Recons., Dkt. #25.)

On April 18, 2012, the bankruptcy court approved a settlement agreement between Hawks Prairie and Homestreet, transferring Lacey Gateway to the bank. The settlement agreement dictated the transfer of Hawks Prairie's rights under the Memorandum of Agreements, presumably including its rights to enforce the covenants. The settlement states that "Hawks Prairie shall convey and sell to Homestreet . . . title to the Real Property, including … all rights, title and interest . . . including without limitation all easements, agreements and rights that run with the Real Property including without limitation the Memorandum of Agreements . . . ." (Sancken Decl., Ex. 7, Dkt. #113-2, p. 62.) The agreement also states that "Hawks Prairie's rights and interests in the . . . Memorandum of Agreements . . . shall be assigned to Homestreet by separate assignments . . . ." (*Id.* at 63.)

The next day, April 19th, approximately six months before the radius restriction expired, Cabela's opened a store on the Tulalip reservation. (Pl.'s Resp. at 5, Dkt. #111.)

On May 11, 2012, the Court granted the parties' agreed motion to allow Homestreet to withdraw. (Order Granting Mot. to Withdraw, Dkt. #45.) Ten days later, Hawks Prairie counterclaimed against Cabela's, asserting breach of the radius restriction. (Def.'s Am. Answer, Dkt. #48.)

**D. Ancillary Factual Issues**

In an effort to establish that it made reasonable efforts at building out Lacey Gateway, Hawks Prairie submitted a declaration from Jeff S. Pantier, a vice president at Hatton Godat Pantier, Inc., an "engineering, surveying, and landscape architecture firm." (Pantier Decl. at 1, Dkt. #106.) Mr. Pantier states that he "recently reviewed [Hawks Prairie's] development activities" and seeks "to confirm the development preparation" of the Lacey Gateway property. (*Id.* ¶ 3.) Cabela's objects to the declaration on the grounds that it is not based on personal knowledge. (Pl.'s Resp. at 21, Dkt. #111.)

Fed. R. Civ. P. 56(c)(4) requires that declarations "must be made on personal knowledge . . . and show that the affiant or declarant is competent to testify on the matters stated." Hawks Prairie argues the Pantier declaration is admissible because Pantier "has been involved with the Lacey Gateway project since 2005." (Def.'s Reply at 15, Dkt. #115.) Regardless, his declaration

fails to explain what information arises from personal knowledge and what information arises from his "review" of activities.  For example, in paragraph 4, Pantier states that "[u]pon information and belief," Hawks Prairie acquired the property in 2005, hired Mithun Architects and MXD Development Strategists to support the development.  (Pantier Decl. at 2 ¶ 4, Dkt. #106.)  Paragraph 5 merely restates the contents of the Purchase and Sale Agreement; paragraph 6 discusses a government grant; paragraph 8 attests to environmental planning performed in 2008–09; and paragraphs 9–10 discuss efforts to qualify for a state financing program.  (*Id.* ¶¶ 5, 6, 8–10.)  Pantier also states that he "understand[s] that Scott Griffin, as manager of Hawks Prairie, was involved in most" of the activities.  (*Id.* ¶ 12.)  At the end, Pantier certifies "[u]pon information and belief" that his declaration is true.  (*Id.* ¶ 19.)  Nowhere does Pantier demonstrate *personal* knowledge of anything.  Perhaps he was personally involved in all of Hawks Prairie's efforts, but he fails to testify to that fact.  The Court therefore grants the motion to strike the Pantier Declaration.

Cabela's also moves to strike the Griffin Declaration and paragraph 5 of the Willig Declaration.  (Pl.'s Resp. at 21, Dkt. #111.)  Mr. Griffin, the managing member of Hawks Prairie, presents the Purchase and Sale Agreement and attests to Hawks Prairie's bankruptcy.  (Griffin Decl., Dkt. #105.) The Court will simply ignore the argumentative portions of the Griffin Declaration as well as ¶ 5 of the Willig Declaration, which appears to be largely speculation.

## II.  DISCUSSION

Based on the foregoing facts, Hawks Prairie argues that Cabela's has breached the radius restriction by opening the Tulalip store early.  (*See* Def.'s Mot. for Summ. J. at 13, Dkt. #104.)  In response, Cabela's argues that the radius restriction is an "unreasonable" restrictive covenant (Pl.'s Resp. at 11, Dkt. #111), that the radius restriction constitutes an unenforceable penalty (*id.* at 14), and that Hawks Prairie anticipatorily breached the agreement by failing to build out Lacey Gateway (*id.* at 18).  Further, Cabela's asserts that it did not breach the agreement because the Tulalip Cabela's isn't really a "Cabela's Store," as the contract defines it and isn't really in

"Western Washington" at all.  (*Id.* at 20.)  Lastly, Cabela's asserts that the radius restriction remedies are ambiguous.

### A. Standard

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

### B. Is the Radius Restriction an Unenforceable Restrictive Covenant?

Cabela's argues that the radius restriction "does not protect a legitimate business interest, harms the public interest, and is unenforceable as a matter of law." (Pl.'s Resp. at 11, Dkt. #111.)  According to Cabela's, Hawks Prairie never built out Lacey Gateway and therefore had no retail spillover traffic to protect. (*Id.* at 12–13.)  Further, the radius restriction would harm the public by depriving the area of "substantial job opportunities." (*Id.* at 13.)

A restrictive covenant "limits the manner in which one may use his or her own land." *City of Olympia v. Palzer*, 107 Wash. 2d 225, 230 (1986) (quoting *Kutschinski v. Thompson*, 101 N.J. Eq. 649, 656, 138 A. 569 (1927)).  A restrictive covenant must be both reasonable and comport with public policy. *Colby v. McLaughlin*, 50 Wash. 2d 152, 155 (1957); *see also Thayer v. Thompson*, 36 Wash. App. 794 796–97 (1984).  In determining whether a contractual provision violates public policy, a court asks "whether the contract as made has a 'tendency to

evil,' to be against the public good, or to be injurious to the public." *Thayer*, 36 Wash. App. at 796 (quoting *Golberg v. Sanglier*, 27 Wash. App. 179, 191 (1980), *rev'd on other grounds*, 96 Wash. 2d 874 (1982)).  Here, where the enforcement dispute lies between the original contracting parties, there is no question of whether the covenant "runs" with the land; rather, the promise is "a matter of the law of contract."  17 Stoebuck & Weaver, *Wash. Practice, Real Estate* § 3.2 (2d ed. 2013).  The Court must conclude that the radius restriction is neither unreasonable nor against public policy.

### 1. The Radius Restriction Is Not a Running Covenant.

First, the parties' dispute concerning the restrictive covenant is abnormal.  Typically, a covenant restricts the use of the land transferred between the parties at the time the covenant is created.  For example, in the case cited by Cabela's, *Colby v. McLaughlin*, 50 Wash. 2d 152 (1957), the Washington Supreme Court considered the enforceability of a covenant barring a commercial property from selling groceries and alcohol for a period of 25 years.  *Id.* at 153.  The covenant protected an adjacent business that sold groceries and alcohol.  *Id.* at 154.  The court upheld the covenant, finding that the time period was limited, and the covenant did not tend to restrain trade.  *Id.* at 156–57 ("Nor is the length of time for which the restriction shall endure unreasonable," and "it [was] not suggested that [the] restriction . . . could tend to create a monopoly or enhance prices.").

Unlike *Colby*, however, the radius restriction is not attached to the Lacey Gateway property at all—it binds Cabela's as a company.  Thus, Cabela's could have sold the Lacey store, and it would still be contractually barred from opening the Tulalip store.  In short, it is bound whether or not it owns the Lacey property, and thus, the arguments about whether or not the radius restriction is a "restrictive covenant" are irrelevant.  It is a contractual clause like any other.

### 2. The Radius Restriction Is a Reasonable, Limited Restraint.

Second, even if the Court considers the clause under precedents relating to restrictive covenants, the restriction is reasonable.  It is limited in time—indeed, it is only one-fifth as long as the restriction upheld in *Colby*.  And the *Colby* court noted that it had previously upheld a

covenant of *unlimited duration* where "the contract is limited as to place." *Colby*, 50 Wash. 2d at 157 (citing *United Dye Works v. Strom*, 179 Wash. 41 (1934)). The restriction here is limited in place: Cabela's was free to open a store in Washington east of the Cascades at any time.

### 3. The Radius Restriction Is a Reasonable Restraint on Trade.

Third, the radius restriction is not counter to public policy; it has no "tendency to evil." Cabela's cites no statute or case law to support its contention, providing only vague notions of harming "substantial job opportunities [in a] depressed area." But that is not the legal test.

In determining whether an agreement not to compete is enforceable, courts ask whether an agreement unreasonably restrains trade, not whether it harms "job opportunities." As the *Colby* court noted, "[t]he only limits imposed by law on [restrictive covenants] . . . are those imposed by public policy." *Id.* at 157 (citing *Messett v. Cowell*, 194 Wash. 646 (1938), *superseded by statute in non-relevant part*, *City of Olympia v. Palzer*, 107 Wash. 2d 225, 231–32 (1986) (quoting 3 Williston on Contract 2888 § 1642)). While public policy "forbids unreasonable restraint of trade," it does not "prohibit contracts which reasonably protect a business of either buyer or seller without tending to affect the public injuriously by monopoly or enhancement of prices." *Id.* That policy is embodied in Washington's Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86.030: "Every contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." The statute is "essentially identical" to the Sherman Antitrust Act, 15 U.S.C. § 1, and courts may therefore consider federal decisions in construing the CPA. *Murray Pub. Co., Inc. v. Malmquist*, 66 Wash. App. 318, 325 (1992) (citing *Boeing Co. v. Sierracin Corp.*, 108 Wash. 2d 38, 54 (1987)).

Not all restraints on trade are unlawful, however; only those restraints that *unreasonably* restrain trade violate the CPA. *Id.* (citing *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)) (additional citation omitted). To make that determination—that is, what restraints are unreasonable—courts apply the aptly-named "rule of reason." *Murray Pub. Co., Inc.*, 66 Wash. App. at 325 (citing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)). There is no suggestion here that the radius restriction falls into the class of *per se*

unreasonable restraints, such as price fixing, dividing markets, or tying.  *See, e.g.*, *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100 (1984).  If a party cannot establish that a restraint is *per se* unreasonable, it must establish that the "challenged practice results in an actual injury to competition."  *Murray Pub. Co., Inc.*, 66 Wash. App. at 326 (citing *Oltz v. St. Peter's Comm'ty Hosp.*, 861 F.2d 1440 (9th Cir. 1988)).  To show actual injury, a party must identify the "relevant market."  *Id.* (citing *Ballo v. James S. Black*, 39 Wash. App. 21, 28 (1984)).  The relevant market is comprised of both the geographic market (the "area of effective competition within which buyers can turn for alternative sources of supply") and the product market (defining the set of products that are "reasonably interchangeable," such that they compete for the "same buyers' dollars").  *Id.* (additional citations omitted).  A party defining the product market is required to present evidence "regarding competitors with the actual or *potential* ability 'to deprive each other of significant levels of business.'"  *Id.* (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991)) (emphasis in original).

   Cabela's has not attempted to define the relevant market—geographic or product.  Nor has it addressed the policy behind the CPA and the Sherman Antitrust Act: preventing an entity from raising prices above the competitive level.  *See National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 109 n.38 (1984) (noting that market power "is the ability to raise prices above those that would be charged in a competitive market.").  The reason Cabela's fails to define the relevant market is simple: the radius restriction does nothing to affect market power or prices.  Cabela's cannot argue that prices for outdoors goods would be higher in Snohomish county without the Tulalip store—especially given the ease of purchasing such goods on the internet.  Further, the radius restriction is essentially an agreement by Cabela's not to compete with *itself*.  But the Tulalip store does not compete with the Lacey store; both are owned by Cabela's, which has no interest in starting a price war between its own stores.  Thus, the radius restriction does nothing to affect prices in Lacey.  The Court must therefore conclude that the radius restriction is a reasonable restraint on trade.

### 4. Changed Circumstances Do Not Invalidate the Radius Restriction.

Fourth, Cabela's argues that the restriction is invalid because Hawks Prairie no longer has a valid business interest to preserve—it went bankrupt. (Pl.'s Resp. at 12, Dkt. #111) ("By the time Hawks Prairie filed its claims in May 2012, the restrictive covenant no longer served any legitimate business purpose."). The Court cannot, however, re-write the parties' contracts. To do so would undermine the certainty of the contract as a legal instrument. Under Cabela's proposed course of action, courts would be free to entertain lawsuits at any time to determine whether a party had sufficient interests in its own contracts. This Court cannot imagine a faster route to frivolous litigation.

### C. Is the Radius Restriction an Unenforceable Penalty?

Cabela's next argues that the liquidated damages provided by the contract—repayment of the $5 million and repossession of the property—constitutes a penalty and is therefore unenforceable. (Pl.'s Resp. at 14, Dkt. #111.) Further, it argues that the liquidated damages provision is unenforceable because the breach was only partial and because enforcement is unconscionable. (*Id.* at 14–15.)

### 1. Liquidated Damages Clause as Penalty

"True liquidated damages clauses, those that are not penalties, are favored and will be upheld." *Walter Implement, Inc. v. Focht*, 107 Wash. 2d 553, 558 (1987) (citations omitted). But, a contractual provision for damages that "bears no reasonable relation to actual damages will be construed as a penalty." *Id.* at 559 (citations omitted). Washington courts follow the U.S. Supreme Court in holding that "liquidated damages agreements fairly and understandingly entered into by experienced, equal parties with a view to just compensation for the anticipated loss should be enforced." *Id.* (citing *Wise v. United States,* 249 U.S. 361, 365 (1919)) (additional citations omitted). Such clauses "may facilitate the calculation of risks and reduce the cost of proof," and they "may afford the only possibility of compensation for loss that is not susceptible of proof with sufficient certainty." *Wallace Real Estates Inv., Inc. v. Groves*, 124 Wash. 2d 881, 886–87 (1994).

"Serious consideration" should be given to the fact that the contracting parties "designate[d] a sum as liquidated damages," but the designation is not conclusive. *Walter Implement, Inc.,* 107 Wash. 2d at 559. Rather, courts look "to the intention of the parties." *Id.* Courts apply a two-part test in distinguishing a valid liquidated damages clause from an invalid penalty: (1) the "amount fixed must be a reasonable forecast of just compensation for the harm that is caused by the breach"; and (2) the harm must be "very difficult" or impossible to ascertain. *Id.* (citations omitted); *see also* Restatement (Second) of Contracts § 356 (1981) (providing similar test). Importantly, courts assess the reasonableness of a forecast at "the time the contract was entered." *Id.*

The Court must conclude that the liquidated damages provision is valid.

### a. The Amount Fixed Is a Reasonable Forecast.

First, the amount fixed is a reasonable forecast of potential damage judged at the time of contracting. In 2006, when the parties signed the Purchase and Sale Agreement, Hawks Prairie committed to paying $5 million and more or less giving 27 acres to Cabela's. In return, Hawks Prairie got an exclusive anchor tenant for a minimum of 12 years. The parties may have reasonably forecast that if Cabela's built a competing store nearby, whether in Snohomish County or elsewhere in western Washington, it would draw enough customers from Lacey Gateway to potentially ruin the project. Indeed, Hawks Prairie's entire economic plan was to sell or lease commercial space around the Cabela's store. If a competing Cabela's store undermined the ability to sell that space, it could have caused the project to fail. If the project failed, Hawks Prairie would have lost exactly what it put in: $5 million and the land.

### b. The Harm Was Impossible to Ascertain at the Time of Contract.

Second, the harm was difficult, and probably impossible, to ascertain at the time of contract. In 2007, the parties could not have precisely forecast how far customers would travel to visit the store, where precisely a new store could be placed such that it would not cannibalize customers from the Lacey store, and most importantly, the number of customers a new store might pull away from the Lacey store. In other words, neither party could be entirely certain that the Lacey Gateway project as a whole would survive if Cabela's built a competing store.

But the parties did know one thing: Hawks Prairie had paid $5 million and given Cabela's 27 acres of land in the deal. If Cabela's breached its end of the bargain, the parties agreed that Hawks Prairie would get its money and land back. Thus, the liquidated damages provision very much resembles rescission.

Lastly, Cabela's cites the declaration of J. Scott Griffin in the bankruptcy proceeding, where Mr. Griffin repeatedly refers to the liquidated damages clause as a "penalty." (Pl.'s Resp. at 16, Dkt. #111.) The Court is unconcerned with Mr. Griffin's colloquial use of the word "penalty." In normal usage, "penalty" means "a loss, forfeiture, suffering or the like, to which one subjects oneself by nonfulfillment of some obligation," or a "consequence or disadvantage attached to any action." Random House, Unabridged Dictionary (June 13, 2013), http://dictionary.reference.com. A person might well refer to paying another person $5 million as a "penalty" without attaching legal significance to the semantics.

### 2. Partial Breach

Cabela's argues that its breach is only partial, and a liquidated damages provision is unreasonable "if it applies regardless of whether the party's breach is total or partial." (Pl.'s Resp. at 15, Dkt. #111.) "To penalize Cabela's for an alleged partial breach when it is undisputed that Cabela's fulfilled the vast majority of its contractual obligations would be fundamentally unfair and unreasonable." *Id.* In support of this proposition, Cabela's cites *Northwest Collectors, Inc. v. Enders*, 74 Wash. 2d 585, 594 (1968), where the defendant failed to pay the rent on a leased tractor. Under the lease, if the defendant defaulted, he was immediately liable for the full amount of the lease—"whether his breach was total or partial and whether or not the property was fully depreciated." *Id.* at 594. Thus, the acceleration clause allowed the lessor to recover the full amount of the lease whether or not he re-let the tractor. *Brower Co. v. Garrison*, 2 Wash. App. 424, 434–35 (1970) (discussing *Northwest Collectors*). In *Brower Co. v. Garrison*, 2 Wash. App. 424 (1970), the Washington court of appeals distinguished *Enders* on grounds relevant here: actual damages in *Enders* were readily calculable—and they did not reflect the liquidated damages. *Id.* at 435 (noting that in *Northwest Collectors* "the anticipated damages were not difficult to ascertain, because the contract itself provided a measure of actual

damages."). As the *Brower* court stated, because the "anticipated damages are by their very nature difficult to ascertain," this case is "controlled by different principles." *Id.* Here, unlike *Northwest Collectors*, actual damages could not be readily calculated and certainly could not have been accurately estimated at the time of contract.

As a matter of policy, again, Cabela's reasoning would undermine the certainty of contracts. When a contract mandates action (or inaction) during a given period and provides liquidated damages for breach, should a court declare the damages unenforceable when the term is eighty-percent complete? Ninety-percent complete? Ninety-five? This Court is unwilling to declare that parties may escape liquidated damages clauses if they *mostly* fulfill their obligations. If Cabela's wanted to build the Tulalip store four years after the Lacey store, it could have bargained for that right. It didn't.

### 3. Unconscionability

Cabela's further argues that the difference between the liquidated damages and the actual damages is so large as to make the provision unconscionable. (Pl.'s Resp. at 15, Dkt. #111.) While actual damages is "no longer a requirement" for enforcing a liquidated damages clause, "nevertheless, actual damages may be considered where they are so disproportionate to the estimate that to enforce the estimate would be unconscionable." *Wallace Real Estate Inv., Inc. v. Groves*, 124 Wash. 2d 881, 894 (1994). As the court stated, "[w]hile probable injury largely determines whether a pre-estimate of injury is reasonable, 'the justice and equity of enforcement depend also upon the amount of injury that has actually occurred . . . the court cannot help but be influenced by its knowledge of subsequent events.'" *Id.* at 894 (quoting 5 Arthur L. Corbin, *Contracts* § 1063 at 363–64 (1964)). But the Court struggles to see where the equities favor Cabela's. With clear intent to violate its agreement, it built the Tulalip store and opened it early—an event that does not happen overnight.

Moreover, the liquidated damages in this case are something like rescission. The contract simply forces Cabela's to return the $5 million and land given by Hawks Prairie—returning it to its pre-contract position. It is true, however, that the land has appreciated in value significantly since 2007, in no small part due to there being a Cabela's on it. But neither party could have

1  estimated appreciation at the time of contract, and so it is perfectly reasonable that the parties
2  chose to value of the property at time of breach as the most convenient measure of damages.
3        Lastly, Cabela's was quite obviously in the superior bargaining position at the time of
4  contract.  Hawks Prairie had one patch of land and needed an anchor tenant.  It needed Cabela's.
5  Cabela's could have built a store anywhere in western Washington.  It did not need Hawks
6  Prairie.  That conclusion is borne out in the terms of the agreement: Cabela's managed to get
7  paid to build its own store.
8        In sum, equity does not favor Cabela's, and the Court sees nothing unconscionable about
9  returning $5 million and the land to Hawks Prairie.

10  **D.  Did Hawks Prairie Anticipatorily Breach the Agreement?**

11        Cabela's argues that there are "genuine issues of material fact . . . as to whether Hawks
12  Prairie anticipatorily or actually breached the contract first, thus excusing Cabela's
13  performance."  (Pl.'s Resp. at 2, Dkt. #111.)  According to Cabela's, the act of declaring
14  bankruptcy "prevented Hawks Prairie from constructing its promised development," and
15  moreover, a jury could find that Hawks Prairie failed to "use commercially reasonable, best
16  efforts to start construction."  (*Id.* at 18–19.)

17        The contract, however, provides that Cabela's "sole remedy" for breach of the
18  construction obligation is "an increase in the credits to be given [Cabela's] in the event [it] does
19  not operate its store for the full twelve (12) year period . . . ."  (Griffin Decl., Ex. B ¶ 7, Dkt.
20  #105-1, p. 29 (Addendum to Purchase and Sale Agreement)).  Cabela's remedy is contractually
21  limited, and it inexplicably ignores the plain language of the contract in making this argument.

22        **E.  Is the Tulalip Cabela's a "Competing Store," and Is It in "Western
23           Washington"?**

24        **1.  Competing Store**

25        The Memorandum of Agreements bars Cabela's from operating a competing store, which
26  refers to "a Cabela's retail outdoor/sporting goods store as generally operated in the United
27  States by [Cabela's] on the date of this deed, as such operation may hereafter evolve . . . ."
28  (Kelsey Decl., Ex. 4 ¶ 3.8, Dkt. #112-1, p. 46.)  But, Cabela's argues that the Tulalip store is a

Order - 16

"next-generation" store with "fewer amenities," and the Court cannot therefore determine that it is a "Cabela's Store," as the term is used in the contract. (Pl.'s Resp. at 20, Dkt. #111.)

This argument fails the giggle-test. The Tulalip store sells precisely the same "outdoor/sporting goods" as Lacey. Yet Cabela's suggests that the stores do not compete because there are "fewer amenities"—amenities that Cabela's fails to detail in any meaningful way. Even if Cabela's detailed the amenities, the lack of an aquarium does not transform the Tulalip store into something different, and no reasonable factfinder could think otherwise.

Moreover, even if "fewer amenities" was somehow significant, the contract specifically provides that a "Cabela's Store" includes any version that "*may hereafter evolve*." (Kelsey Decl., Ex. 4 ¶ 3.8, Dkt. #112-1, p. 46.) How Cabela's can suggest that the Tulalip store did not even "evolve" from the Lacey store is incomprehensible.

**2. Location in Western Washington**

Likewise, Cabela's suggests—with a straight face—that the Tulalip store is not in western Washington because it lies on "a reservation," which is "distinct and separate from a bordering county." (Pl.'s Resp. at 21, Dkt. #111.) Citing cases on tax jurisdiction does nothing to help its case. *See id.* (citing *Foster v. Pryor*, 189 U.S. 325 (1903)). The radius restriction listed specific counties in order to outline the *geographic* area in which Cabela's was barred from opening another store. The Tulalip store lies squarely within that outline—Snohomish County. Geography and jurisdiction are not the same thing.

**F. Impracticality**

Cabela's next asserts that "shuttering the Tulalip store for seven months would have cost hundreds of jobs," and this would have been impractical as a matter of law. (Pl.'s Resp. at 21, Dkt. #111.) The doctrine of impossibility "excuses a party from performing a contract where performance is impossible or impracticable due to extreme and unreasonable difficulty, expense, injury or loss." *Metro. Park Dist. of Tacoma v. Griffith*, 106 Wash. 2d 425, 439–440 (1986) (citing *Thornton v. Interstate Sec. Co.*, 35 Wash. App. 19, 30 (1983); Restatement of Contracts § 454 (1932)). Importantly, the "event which renders performance impossible *must be fortuitous and unavoidable* on the part of the promisor." *Id.* (emphasis added).

The construction of the Tulalip store was neither "fortuitous" nor "unavoidable." It did not spring forth from the earth of its own accord. Cabela's was not forced to cut the grand-opening ribbon before November 2012. The doctrine of impracticality has no application here.

**G.  Standing**

Cabela's challenges Hawks Prairie's standing to assert counterclaims because Hawks Prairie "transferred the land before filing its counterclaims." (Pl.'s Resp. at 13, Dkt. #111.) The Memorandum of Agreements, as noted above, provides that Cabela's covenants "shall inure to the benefit of [Hawks Prairie] and to any assignee or transferee to whom Seller may specifically and expressly assign any or all of such rights . . . ." (Kelsey Decl., Ex. 4 ¶ 3, Dkt. #112-1, p. 48.) And the settlement agreement between Hawks Prairie and Homestreet would appear to transfer these rights: "Hawks Prairie shall convey and sell to Homestreet . . . title to the Real Property, including … *all* rights, title and interest . . . including . . . limitation the Memorandum of Agreements . . . ." (Sancken Decl., Ex. 7, Dkt. #113-2, p. 62.)

Hawks Prairie, on the other hand, states that the agreement between it and Homestreet "specifically carves out Hawks Prairie's ownership of the continued prosecution of this litigation with Cabela's." (Def.'s Reply at 9, Dkt. #115.) In support of this contention, Hawks Prairie cites "*See* Bankr. Docket No. 395." That document is a two-page bankruptcy-court order that withdraws the claims of certain creditors. The Court fails to understand how this constitutes a "specific carve-out."

More confusingly, Cabela's agreed to Homestreet's withdrawal from this litigation three weeks *after* the bankruptcy court approved the transfer of Lacey Gateway to the bank. (*Compare* Agreed Mot. to Dismiss Party, Dkt. 43 (May 8, 2012), *with* Order on Mot. for Approval of Settlement, *In re: Hawks Prairie Investment LLC*, No. 10-46635-BDL (Bankr., W.D. Wash. Apr. 18, 2012)). If Cabela's believed that the owner of the property was the only party with standing to be subject to or to enforce the covenant, why would it release Homestreet?

The Court feels that there is insufficient briefing on the issue of standing. Hawks Prairie is instructed to provide no more than five pages of briefing on the issue of standing within **15**

**days** of this order.  If Cabela's wishes to respond, it may do so within **7 days** following Hawks Prairie's brief.

### H. Remedy

Cabela's asserts that even if it is liable, Hawks Prairie's claim to the "fair market value" of the property is based on a "misreading of the agreement." (Pl.'s Resp. at 17, Dkt. #111.)  This misreading arises from a discrepancy between ¶ 8 and ¶ 6 of the agreements.

Under ¶ 8, if Cabela's opens a competing store within five years, it "shall repay" the $5 million, and Hawks Prairie "shall have the right to *terminate and repossess* the Real Property as set forth … in Paragraph 6." (Kelsey Decl., Ex. 2 ¶ 8, Dkt. #112-1, p. 31) (emphasis added).  Paragraph 6, however, does not specifically use the language "terminate and repossess."  Rather, it lays out two possible remedies: (1) Cabela's will "pay to [Hawks Prairie] an amount equal to the then fair market value . . . and refund" the $5 million payment; or (2) it will refund the $5 million and provide a 60-day option to purchase the property and improvements at fair market value "minus the fair market value of the [r]eal [p]roperty." (*Id.*)  Cabela's believes that "the only reasonable interpretation" is that the language refers to the 60-day option—the only remedy that allows Hawks Prairie to "repossess" the land. (Pl.'s Resp. at 17, Dkt. #111.)

In contrast, Hawks Prairie argues that ¶ 8 provides that Hawks Prairie "may sue [Cabela's for damages . . . [and] [i]n *addition* . . . [Cabela's] shall repay" the money and have the right to repossession. (Def.'s Reply at 4, Dkt. #115.)  Thus, under Hawks Prairie's reading, the $5 million and the value of the land is owed as damages, regardless of the options provided in the contract.

Like the standing issue, the Court feels that the parties may wish additional briefing on this issue. Cabela's is instructed to provide no more than five pages of briefing on the issue of remedies within **15 days** of this order.  If Hawk's Prairie wishes to respond, it may do so within **7 days** following Cabela's brief.

### III. CONCLUSION

At heart, it is clear that Cabela's made a financial decision: it would make more money by breaching the radius restriction than it was likely to pay in damages—a classic efficient

breach.  This lawsuit appears to be nothing more than an effort to reduce the amount owed, or perhaps simply to delay payment while interest accrues.  But it has breached the contract, and some remedy is available.  The issues of standing and remedies require additional briefing as set forth in § II.G–H of this opinion.  Those matters will be set aside for oral argument on **July 11, 2013** at 10:00 a.m.

The Clerk is directed to **STRIKE** the Pantier Declaration (Dkt. #106).  Hawks Prairie's Motion for Summary Judgment (Dkt. #104) is **GRANTED IN PART** as set forth above.

Dated this 18th day of June 2013.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE